**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DENNIS HUMMEL, individually and as representative of a class of participants and beneficiaries in and on behalf of the EAST PENN MANUFACTURING CO., INC. PROFIT SHARING & 401(K) SAVINGS PLAN, | )<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)  CLASS ACTION |
| Plaintiff, | ) |
| v. | )<br>) |
| EAST PENN MANUFACTURING CO., INC., THE BOARD OF DIRECTORS OF EAST PENN MANUFACTURING CO., INC., | )<br>)<br>)<br>) |
| and | ) |
| THE ADMINISTRATIVE COMMITTEE OF THE EAST PENN MANUFACTURING CO., INC. PROFIT SHARING & 401(K) SAVINGS PLAN, | )<br>)<br>)<br>)<br>) |
| and | ) |
| JOHN AND JANE DOES 1-30, | )<br>) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff Dennis Hummel ("Plaintiff"), on behalf of the East Penn Manufacturing Co., Inc. Profit Sharing & 401(k) Savings Plan (the "Plan" or the "East Penn Plan"), himself as a Plan participant, and all others similarly situated, by and through his attorneys, alleges as follows:

## I.    NATURE OF ACTION AND INTRODUCTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants. This action asserts claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and

(3) against the Plan's fiduciaries, which include: East Penn Manufacturing, Inc., The Board Of Directors of East Penn Manufacturing Co., Inc., and the Administrative Committee of the East Penn Manufacturing Co., Inc. Profit Sharing & 401(K) Savings Plan, and John and Jane Does 1-30 (collectively, "Defendants").

2.      Every year, millions of employees entrust their retirement savings to plans established under ERISA. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act loyally and prudently to protect plan participants and their hard-earned retirement dollars.

3.      As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* James McWhinney, *The Demise of the Defined-Benefit Plan*, Investopedia (Updated Nov. 16, 2020), https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp. Today, only 17% of private sector employees have access to a defined benefit plan, while 64% have access to a defined contribution plan. *Id*.

4.      The essential remedial purpose of ERISA is to protect the beneficiaries of private retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses being assessed to a plan in order to make sure those charges are reasonable and prudent.

5.      Failures by ERISA fiduciaries to monitor costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

6.     The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts, which is determined by the market performance of contributions, less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the employee.

7.     The table below illustrates how retirement plan services ("RPS") fees impact retirement accounts over time.[1] The table illustrates that when an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000 less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the below SEC example (*see, e.g.*, Net Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement Research, Investment Returns: Defined Benefit vs. Defined Contribution Plans, December 2015, Number 15-21, p. 3, Table 4. Center for Retirement Research).

---

[1] *See* https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited Mar. 25, 2021).



8.     Indeed, the Third Circuit Court of Appeals recently noted:

Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan . . . by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[2]

9.     The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or discretionary control over the Plan, which Defendants sponsor and administer.

10.     ERISA imposes strict fiduciary duties of prudence upon Defendants as Plan fiduciaries, pursuant to 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among "the highest known to the law." *Sweda*, 923 F.3d at 333 (internal citation and quotations omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar

---

[2] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted).

scope. 29 U.S.C. § 1104(a)(1)(B). As fiduciaries to the Plan, Defendants were and are obligated to prudently ensure that Plan fees and expenses are reasonable.

11.     Defined contribution retirement plans are often categorized in terms of the value of the assets in the plan. For example, plans with less than $5 million in assets are often classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

12.     With 10,231 participants and over $557 million in net assets as of May 31, 2020, based on publicly available Form 5500 data the Plan is larger than 99% of defined contribution plans in terms of participants and assets, and is thus considered a "large" retirement plan.

13.     The marketplace for RPS is well-established and highly competitive. Having had between $400-$550 million in assets, the Plan was a "large" plan since at least 2015 and, as a result, had tremendous bargaining power to demand low-cost administrative and investment management services.

14.     Prudent plan fiduciaries continuously monitor both (1) investment options against applicable benchmarks and peer groups, and (2) the market for reasonable RPS fees, in order to identify objectively unreasonable and unjustifiable fees.

15.     But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, Defendants caused the Plan to imprudently pay unreasonable and excessive fees for RPS in relation to the services being provided to the Plan.

16.     Upon information and belief, during the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff, and all other Plan participants by:

a.      Imprudently failing to monitor the RPS fees paid by the Plan to ensure that they were reasonable and, as a result, causing the Plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS received;

b.      Imprudently failing to take standard and customary actions to understand the market for RPS in order to monitor for reasonableness the RPS fees paid by the Plan in relation to the RPS received; and

c.      Imprudently failing to take standard and customary actions to understand the market for RPS in order to monitor for reasonableness the RPS fees paid by the Plan in relation to the RPS received.

17.     The objectively unreasonable RPS fees charged to the Plan by Defendants cannot be justified. During the Class Period, the Plan paid between $101 and $113 per participant annually for RPS. During the Class Period, reasonable RPS fees for a plan of this size would have averaged $43 per participant annually.

18.     Defendants' failures to monitor RPS fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiff, Plan participants, and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor the market for RPS to ensure the fees paid by the plan are reasonable. Defendants did not engage in prudent decision-making processes, but decided instead to remain with Wells Fargo Bank, N.A. ("Wells Fargo") and not seek competitive bids or otherwise determine the market for RPS. There is no other explanation for why the Plan paid objectively unreasonable fees for RPS.

19.     Plaintiff was injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive RPS fees, which reduced Plaintiff's and other Plan participants' account balances and caused them significantly diminished investment returns.

20.     To remedy Defendants' fiduciary breaches, Plaintiff, individually and as the representative of a class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

21.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiff reserves the right to amend this Complaint as those materials become available in the course of this litigation.

## II.     <u>JURISDICTION AND VENUE</u>

22.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*

23.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

24.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because

Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### A.   Plaintiff Dennis Hummel

25.     Plaintiff Dennis Hummel is a resident of Kutztown, Pennsylvania. Mr. Hummel is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because he has a vested account balance in the Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. At all relevant times, Mr. Hummel was and is a participant in the Plan. During the Class Period, Mr. Hummel paid excessive RPS fees and suffered diminished returns by investing in the profit-sharing investment options.

26.     Mr. Hummel has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account in which he is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

27.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Mr. Hummel's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Mr. Hummel and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Mr. Hummel.

28.     Mr. Hummel did not have knowledge of all material facts (including, among other things, the RPS and total cost comparisons to similarly-sized plans) necessary to understand that

Defendants breached—and continue to breach—their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Hummel lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

**B.    Defendants**

29.    Defendant East Penn Manufacturing, Inc. ("East Penn")[3] is a company with a principal place of business located at 102 Deka Road, Lyon Station, Pennsylvania 19536. Per the Plan's Forms 5500, East Penn is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). As the Plan Administrator, East Penn is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). East Penn has responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. East Penn acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. East Penn appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

30.    Defendant Board of Directors of East Penn Manufacturing, Inc. ("Board") is located at 102 Deka Road, Lyon Station, Pennsylvania 19536. Upon information and belief, the

---

[3] In this Complaint, "East Penn" refers to the named Defendant East Penn Manufacturing, Inc. and all parent, subsidiary, affiliated, predecessor, and successor entities to which these allegations pertain.

Board is responsible for the administration and/or oversight of the Plan. The Board members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

31.     Defendant Administrative Committee for the East Penn Manufacturing, Inc. Profit Sharing & 401(k) Savings Plan ("Committee") is, on information and belief, located at 102 Deka Road, Lyon Station, Pennsylvania 19536. Upon information and belief, the Committee is responsible for the administration of the Plan. The Committee members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

32.     Defendants John and Jane Does 1-30 are unknown individuals comprised of the members of the Board, members of the Committee, any officers, directors, or employees of East Penn, or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiff reserves the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

33.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

     **C.**     **The East Penn Manufacturing, Inc. Profit Sharing & 401(k) Savings Plan**

34.     The name of the Plan is the East Penn Manufacturing, Inc. Profit Sharing & 401(k) Savings Plan. The Plan's Employer Identification Number (EIN) is 25-1723345 and the Plan has been assigned the three-digit plan number 001.

35.     The Plan is a defined contribution pension plan covering substantially all employees of East Penn and its subsidiaries. The Plan is subject to ERISA and is, on information

and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

36.     The Plan allows participants to contribute to the Plan through pre-tax deductions from their pay. East Penn also makes an annual profit-sharing distribution to the Plan as determined annually by East Penn's Board. The profit-sharing contributions are allocated using a formula based on a participant's annual compensation and years of service. On termination of service, participants receive a lump-sum amount equal to the value of the participant's vested interest in his or her account.

37.     The profit sharing contributions are segregated from the participant 401(k) contributions. Plan participants may direct their portion of the East Penn profit sharing contributions into one of three unitized funds managed by Wells Fargo:

      a.     East Penn Fund A, an equity fund benchmarked to the Morningstar Moderately Aggregate Target Risk index.

      b.     East Penn Master Fund B, a bond fund benchmarked to the Barclay's US Aggregate Bond TR USD index.

      c.     East Penn Profit Sharing Fund C, a money market fund benchmarked to US Treasury T-Bill Constant Mature Rate 3 Year.

38.      Plan participants are vested in East Penn's profit-sharing and employer matching contributions on the following schedule:

      0-1 years: 0 %

      2 years: 20%

      3 years: 40%

      4 years: 60%

5 years: 80%

6 years: 100%

IV.     **FACTUAL BACKGROUND**

A.     **Overview Of Retirement Plan Services In Defined Contribution Plans**

39.     In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust. The plan allocates the trust assets among plan participants through an RPS provider (often referred to generically as a "recordkeeper") that tracks each participant's account, which consists of his/her share of plan investments and returns.

40.     Fiduciaries of virtually all "large" defined contribution plans hire one RPS provider to provide the essential Recordkeeping & Administrative ("RK&A") services for a plan. RK&A services are necessary for defined contribution plans, and often include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

41.     RPS includes the RK&A services as well as fees for other services such as individual transactions and/or services that are utilized only by specific participants, e.g., loan initiation and maintenance fees, Qualified Domestic Relations Order services, etc. The fees charged for participant-specific services typically account for an immaterial portion of the total fees charged for providing RPS.

42.     Some providers of RPS provide purely RK&A, while others are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

43.     Since the mid-2000s, RPS provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While RPS providers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most RPS providers offer the same bundles and combinations of services as their competitors. As a result, the market for defined contribution RPS is highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

44.     In recent decades, the fee that RPS providers have been willing to accept for providing RPS has significantly decreased.

45.     By the start of and during the entire Class Period, the level of fees that RPS providers have been willing to accept for providing RPS, including RK&A services, has stabilized, and has not materially changed. In other words, reasonable RPS fees paid in 2018 are representative of the reasonable fees for RPS during the entire Class Period.

46.     RPS providers for larger defined contribution plans, like the Plan, experience advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the RPS provider can spread the cost of providing RPS over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

47.     Moreover, the cost to an RPS provider to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the

participant's account. In other words, the average cost to provide RPS is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

48.     Therefore, while the total cost to provide RPS increases as more participants join the plan, the cost per participant to deliver the RPS decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

49.     Sponsors of defined contribution plans negotiate and contract for RPS separately from any contracts related to the selection of investment management services provided to plan participants.

50.     RPS providers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

51.     Regardless of the pricing structure that the plan fiduciaries negotiate with the RPS provider, the amount of compensation paid to the RPS provider must be reasonable.

52.     As a result, plan fiduciaries must understand the total dollar amounts being paid to their RPS provider(s) and be able to determine whether the compensation is reasonable by evaluating what the market is for the RPS being received by the plan.

53.     Because RPS fees are actually paid in dollars and because of the cost dynamic noted above, the fees paid for RPS are evaluated and compared on a dollars-per-participant basis.

54.     It is axiomatic in the RPS industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant RPS fee should decrease, assuming the same services are provided.

**B.      Standard Of Care For Prudent Fiduciaries Selecting
         And Monitoring RPS Providers**

55.      Plan fiduciaries are required to fully understand all sources of revenue received by RPS providers. Fiduciaries must regularly monitor the revenue being paid to RPS providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

56.      The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[4]

57.      The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[5]

58.      Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for RPS by soliciting competitive bids from other RPS providers to perform the same services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most RPS providers would require only the number of participants and the amount of the assets to provide a quote for RPS, while others might only require the number of participants.

---

[4]  *See* United States Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019), at 2, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.
[5]  Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

59.     Prudent fiduciaries have all of this information readily available and can easily receive a quote from other RPS providers to determine if the current level of fees being charged to the plan is reasonable.

60.     Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new RPS provider to provide the same (or better) services for a competitive (or lower), reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

61.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the RPS fees on behalf of participants, which is the most beneficial to plan participants. If the employer pays the fee, the employer has an interest in negotiating the lowest fee a suitable RPS provider would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the RPS fees. If the RPS fees are paid by participants, the fiduciaries can allocate the negotiated RPS fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

62.     In other words, if a plan negotiates a per-participant revenue threshold, e.g., $40.00, the plan does not need to require that each participant pay $40.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the RPS fees pro rata to participants. For example, a 10,000-participant plan with a $40.00 revenue threshold would pay $400,000 in RPS fees. If the Plan had $400,000,000 in assets, then the $400,000 would work out to 10 basis points. Accordingly, the Plan could allocate the $400,000 to participants by requiring that each participant pay 10 basis points.

63.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the services provided by the RPS provider do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPS provider increases. This structure was historically preferred by RPS providers because it allowed RPS providers to obtain an increase in revenue without having to ask the client to pay a higher fee.

64.     By 2013, prior to the Class Period, the impact of the 2012 Fee Disclosure regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, in its 2013 publication, "DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance," Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

1.  Price administrative fees on a per-participant basis.
2.  Benchmark and negotiate recordkeeping and investment fees separately.
3.  Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4.  Benchmark and negotiate recordkeeping and trustee fees at least every other year.
5.  Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.
6.  Monitor actual fees paid against contractual requirements.
7.  Review services annually to identify opportunities to reduce administrative costs.[6]

---

[6] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013).

65.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs.

66.     First, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the RPS provider's expenses by demanding documents that summarize and contextualize the RPS provider's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports. This would include information from all revenue, not just RPS revenue, that is generated by providers through their relationship with the plan.

67.     Second, to make an informed evaluation as to whether an RPS or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPS provider. To the extent that a plan's investments pay asset-based revenue sharing to the RPS provider, prudent fiduciaries monitor the amount of the payments to ensure that the RPS provider's total compensation from all sources does not exceed reasonable levels and require that any revenue-sharing payments that exceed a reasonable level be returned to the plan and its participants.

68.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will often include conducting a request for proposal ("RFP") process at reasonable intervals. In fact, the best practice standard of care is to undergo a formal RFP process once every three to five years.

69.     On the other hand, however, even without conducting a formal RFP process, as noted above, by merely soliciting bids from other RPS providers, plan fiduciaries can quickly and

easily gain an understanding of the current market for materially identical RPS and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to RPS providers to provide a competitive bid.

70.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

### C.     Defendants Imprudently Permitted The Plan To Pay Excessive RPS Fees

71.     From 2015 through 2020 the Plan's RPS provider was Wells Fargo. During the Class Period, Wells Fargo charged the Plan fees that were excessive relative to the RPS received by the Plan when compared with other similar-sized plans. These excessive fees led to lower net returns, eating into and reducing Plaintiff's and Plan participants' retirement savings. The Plan's Form 5500 for plan year ending May 31, 2021 is not yet publicly available.

72.     From 2015 through 2019, Plan participants paid a flat fee of 21 basis points (.021%) of their account balances for RPS directly through deductions from their accounts. Starting December 1, 2018, Plan participants paid a flat fee of 15 basis points (.015%). During the Class Period, the Plan disclosed payment of the following RPS fees to Wells Fargo, as seen in Schedule C of the Plan's Forms 5500:

| Compensation to Wells Fargo Bank, N.A. | | | |
| --- | --- | --- | --- |
| (source: Forms 5500, Schedule C) | | | |
| **Plan Year Ended May 31** | **Compensation** | **Service Codes** | **Service Code Explanations** |
| 2015 | $870,259 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| 2016 | $874,155 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| 2017 | $983,289 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| 2018 | $1,105,927 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| 2019 | $1,107,109 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| 2020 | $1,018,688 | 26, 28, 37, 60, 63, 65, 99 | Investment advisory (participants); Investment management; Participant loan processing; Sub-transfer agency fees; Distribution (12b-1) fees; Account maintenance fees; Other fees |
| **Grand Total** | **$5,959,427** | | |

74.     During the Class Period, Plaintiff and Plan participants paid between $100 and $113 per year per participant in RPS expenses. The table below shows the actual and average yearly per-participant RPS fees paid by participants:

| | Retirement Plan Service (RPS) Fees Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Plan Year Ended May 31 | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Participants | 8,307 | 8,661 | 9,014 | 9,773 | 10,231 | 10,232 | **9,369** |
| Total RPS Fees | $870,259 | $874,155 | $983,289 | $1,105,927 | $1,107,109 | $1,018,688 | **$993,237** |
| **Per-Participant RPS Fee** | $105 | $101 | $109 | $113 | $108 | $100 | **$106** |

75.     The table illustrates that the Plan had on average 9,369 participants and paid an average effective annual RK&A fee of approximately $993,237, which equates to an average of approximately $106 per participant, per year. This fee is exorbitant and unreasonable. Moreover, the per-participant fee remained above $100 per participant even after the RPS fee was reduced from 21 basis points to 15 basis points on December 1, 2018.

76.     Defendants' decision to maintain this RPS relationship in which Plan participants were paying on average $106 per person, per year was imprudent. This high per-participant RPS expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries.

77.     The table above also reflects that the per-participant RPS fees for the Plan did not decline in correlation with the year-over-year increase of Plan participants, which grew from 8,307 to 10,232 over a five-year period. The cost of adding participants to a recordkeeping platform is relatively low, and when participant numbers grow, the unit cost of delivering services on a per-participant basis should decrease. This inverse correlation of participants to the effective annual

per-participant RPS fees was not manifested in the Plan during the Class Period. The Defendants should have been able to achieve a decrease in the annual per-participant RPS fee as the number of participants in the Plan grew, but they failed to do so.

78.     The Plan's fiduciaries were required to continuously monitor RPS fees, and to regularly solicit competitive bids to ensure fees being paid to Wells Fargo were reasonable. However, Defendants failed to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable RPS fees paid.

79.     Due to Defendants' fiduciary failures and the absence of prudent fiduciary processes to monitor fees for reasonableness, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than RPS fees assessed to participants in similar plans. The table below illustrates the effective annual per-participant RPS fees paid in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per-participant RPS fee paid by the Plan from 2015 through 2020 as identified in the table above.

| Plan | Participants | Assets | RPS Price | RPS Price /pp | Recordkeeper |
|---|---|---|---|---|---|
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica |

| | | | | |
|---|---|---|---|---|
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity |
| East Penn Manufacturing Co., Inc. Profit Sharing & 401(k) Savings Plan | 9,369 | $502,443,326 | $993,237 | $106 | Wells Fargo |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West |
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |

80. As the above chart makes clear, during the Class Period, both plans with fewer participants (for which the reasonable per-participant RPS fees are higher) and plans with a similar

number of participants paid a significantly lower effective per-participant RPS fee than the Plan paid.

81.     This chart illustrates that other RPS providers would have accepted much lower RPS fees for materially identical services to those provided to the Plan by Wells Fargo.

82.     The level and quality of service provided by Wells Fargo as the Plan RPS provider did not justify paying on average more than two and a half times the reasonable market rate for RPS.

83.     Because the RPS fees are asset-based, Defendants could have capped the total amount of fees to ensure that any excessive amounts were returned to the Plan as other prudently-administered plans do, but failed to do so.

84.     Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with RPS providers, rather than paying an effective average of approximately $106 per participant per year in RPS fees from 2015-2020, the Defendants would have identified one of the many RPS providers that would have accepted on average around $40 per participant per year for the Plan.

85.     The $106 per-participant-per-year average is more than 2.5 times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent process for selecting and monitoring the fees of RPS providers. Prudent fiduciaries would have never initially agreed to the RPS fees being assessed to the Plan participants starting in 2015, nor would prudent fiduciaries have permitted the unreasonable RPS fees to continue in perpetuity.

86.     Had the Plan been charged a reasonable RPS asset-based fee of 8 basis points (0.08%) instead of the 21 (0.021%) and 15 (0.015%) basis points actually charged, the Plan participants would have paid an average of $43 per participant per year from 2015 through 2020.

87.     Defendants did not regularly and/or prudently assess the Plan's RPS fees being paid to Wells Fargo. Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Wells Fargo vis-à-vis the fees that other RPS providers would charge for the same services from, at least, 2015 through 2020. Had Defendants done so, they would have saved the Plan and its participants millions in lost retirement savings.

88.     Defendants knew or should have known that ERISA's duties of prudence required them to consider and seek quotes from RPS providers other than Wells Fargo in view of the fees Wells Fargo was charging, and to engage in processes to evaluate the reasonableness of the Plan's RPS fees, but Defendants simply failed to do so. Had Defendants done so, they would have concluded that the Plan was compensating Wells Fargo unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and that the fees were excessive relative to the services received.

89.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RPS fees and their failure to take effective remedial actions shows a lack of, or a complete disregard for, a prudent process, and was a breach of their fiduciary duties to Plaintiff and the Plan participants.

90.     Defendants imprudently failed to monitor and control the asset-based compensation paid by the Plan for RPS to Wells Fargo. Had Defendants monitored the compensation paid to Wells Fargo and ensured that participants were only charged reasonable RPS fees, Plan

participants would not have lost millions of dollars in their retirement savings over the last six years.

## V.    <u>ERISA'S FIDUCIARY STANDARDS</u>

91.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

92.    As set forth above and herein, Defendants are Plan fiduciaries. ERISA imposes strict fiduciary standards of prudence on Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> (1)    . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A)  for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> * * *
>
> > (D)  in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

93.    29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

94.     ERISA fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants. ERISA fiduciaries exercising authority or control over plan assets, including the selection of plan service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of others, including RPS providers to the Plan or firms who provide investment products and services. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1).

95.     Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for reasonableness.

96.     ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

97.     29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

98.     Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VI.   CLASS ACTION ALLEGATIONS

99.     Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

100.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as the representatives of, the following class (the "Class"):

> All participants in and beneficiaries to the East Penn Manufacturing, Inc. Profit Sharing & 401(k) Savings Plan from April 7, 2015, through the date of judgment.

101.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

102.    This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons:

103.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending May 31, 2020, the Class includes at least 10,232 individual current Plan participants.

104.    **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    whether Defendants were fiduciaries to the Plan under ERISA;

c.    whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

      d.      whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

      e.      if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

      f.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

      g.      whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

105.    Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

106.    **Typicality**: All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was, and is, a Plan participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

107.    **Adequacy:** Plaintiff is an adequate representative for the Class because Plaintiff's interests do not conflict with the interests of the Class that he seeks to represent; Plaintiff was a Plan participant during the Class Period and continues to participate in the Plan; and Plaintiff is committed to vigorously representing the Class. Plaintiff has retained counsel who are competent and highly experienced in complex class action litigation – including ERISA and other complex

financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

108.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

109.    Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VII.    CAUSES OF ACTION

### COUNT I
**Breach of Duty of Prudence Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class against all Defendants)**

110.    Plaintiff incorporates the above allegations as if fully set forth herein.

111.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

112.    29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

113.    Defendants, as fiduciaries of the Plan, are responsible for selecting an RPS provider that charges reasonable RPS fees.

114.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

a.    ensure that the Plan's RPS fees were reasonable;

b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

c.    defray reasonable expenses of administering the Plan; and

d.    act with the care, skill, diligence, and prudence required by ERISA.

115.    During the Class Period, Defendants had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

116.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiff, by:

  a.  Allowing the Plan to pay multiples of the reasonable per-participant amount for the Plan's RPS fees;

  b.  Failing to defray reasonable expenses of administering the Plan; and

  c.  Failing to act with the care, skill, diligence, and prudence required by ERISA.

117. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's RPS provider in comparison to other RPS options.

118. Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

119. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims, thus breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

120. As a result of Defendants' breach of fiduciary duties, Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

121. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries Under ERISA:
### Imprudent and Unreasonable RPS Fees
### (Plaintiff, individually and on behalf of the Class against East Penn and the Board)

122.   Plaintiff incorporates the above allegations as if fully set forth herein.

123.   Defendants East Penn and the Board had the authority to appoint and remove individuals responsible for RPS fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

124.   In light of this authority, East Penn and the Board had a duty to monitor those individuals responsible for overseeing RPS fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

125.   East Penn and the Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analyses respecting Plan decisions; and reported regularly to East Penn and the Board.

126.   East Penn and the Board breached their fiduciary duties by, among other things:

a.      Failing to monitor and evaluate the performance of individuals responsible for RPS fees for the Plan, or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RPS fee expenses;

b.      Failing to monitor the process by which the Plan RPS provider was evaluated and failing to investigate the availability of lower-cost RPS providers; and

c.      Failing to remove individuals responsible for RPS fees for the Plan whose performance was inadequate in that these individuals continued to allow the Plan to pay the same RPS fees even though benchmarking and using other similar comparators would have shown that maintaining Wells Fargo as the RPS provider altogether or at the current level of fees being paid to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings. As consequences of the foregoing fiduciary breaches, Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

127.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), East Penn and the Board are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for RPS fees for the Plan. In addition, Plaintiff is entitled to equitable relief and other appropriate relief.

## VIII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designate Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

C.      A declaration stating that Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RPS fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      Such other and further relief as the Court deems equitable and just.

## IX.    **NOTICE PURSUANT TO ERISA SECTION 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as approved by the Court, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: April 7, 2021

By: */s/ Steven A. Schwartz*
Steven A. Schwartz (PA ID No. 50579)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: 610-649-3633
Email: sas@chimicles.com

Paul R. Wood (*pro hac vice* forthcoming)
Timothy Foster (*pro hac vice* forthcoming)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone: (303) 757-3300
Fax: (720) 213-5131
Email: woodp@fdazar.com
        fostert@fdazar.com

*Counsel for Plaintiff*